IN the INTEREST OF MICHELLE A.D., a Child Under the
Age of Eighteen:

STATE of Wisconsin, Petitioner-Respondent,

v.

MICHELLE A.D., Respondent-Appellant.†

Court of Appeals

*No. 93–0131. Submitted on briefs November 2, 1993.—Decided
January 25, 1994.*

(Also reported in 512 N.W.2d 248.)

†Petition to review denied.

For the respondent-appellant the cause was submitted on the briefs of *Scott B. Taylor*, of West Allis.

For the petitioner-respondent the cause was submitted on the briefs of *E. Michael McCann*, district attorney by *Lori S. Kornblum*, assistant district attorney, of Wauwatosa.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

WEDEMEYER, P.J. Michelle A.D. appeals from a "Dispositional Order — Child Adjudged Delinquent" finding that she did commit disorderly conduct while armed contrary to §§ 947.01 and 939.63, STATS., and later amended to find that she had possessed a dangerous weapon on school premises, contrary to § 948.61, STATS.

Michelle raises the following issue for our review: Can an unloaded "BB" air pistol legally qualify as a dangerous weapon under § 948.61, STATS., when there is no present intention or ability to use the "BB" air pistol, and there is no attendant crime being committed by the possessor? Because we conclude as a matter of law that a BB gun is a dangerous weapon and, because the facts support the trial court's finding that Michelle possessed the weapon on school premises, we affirm the trial court's order.

## I. BACKGROUND

The finding of delinquency in this case arises from an incident which took place on February 13, 1992, at the Kosciuszko Middle School in Milwaukee, Wisconsin. Michelle A.D., a student at the school, was in a suspension status. She walked to school to discuss possible reinstatement from suspension with the principal. She wore her father's coat because her coat had been stolen some time before.

Upon arriving at the school, Michelle hung the coat in her locker and sought out the principal. She eventually located the principal in the cafeteria. The principal instructed her to return to her home because a parent had to accompany her as a prerequisite for reinstatement.

Michelle returned to her locker, put on her coat and started to leave the school building. As she walked towards the door, several students standing nearby told her that she had a gun in the pocket of her coat. She pulled the gun from the pocket and checked to see if it was loaded by pulling back the clip. At or about the same time, several other students ran into a classroom where a teacher, Ms. Pieper, was conducting class. The students explained to Pieper that a girl in the hallway was carrying a gun. Pieper, in investigating the report, found Michelle standing with some other girls. Pieper saw that Michelle had in her hand what appeared to be a real gun. Pieper observed Michelle put the gun under her coat and walk away down the hallway.

Pieper followed Michelle down a flight of stairs to the first floor. She then heard what sounded like "an action on a gun like a rifle where the bolt is pulled back, the rifle makes a sound." Becoming fearful, Pieper stepped into the school library and reported the incident to security. Police arrived at the school shortly

thereafter. Following a discussion of the events, the police proceeded to Michelle's home. The police found Michelle home alone. Michelle told the officer that her younger brother had hidden the gun in the basement. After a search, the gun was recovered and it turned out to be a "BB and pellet gun,"[1] a gun that shoots projectiles with the aid of compressed air. The police arrested Michelle and conveyed her to Children's Court Center.

At a bench trial to determine delinquency, Michelle testified that the gun was not hers, but her brother's, and, because of the size of the coat that she wore, she did not know that the gun was in the pocket of the coat until informed by observing students. The gun was received in evidence. The trial court adjudicated Michelle as delinquent. She now appeals.

## II. DISCUSSION

The issue raised by Michelle is one of first impression, i.e., the application of the definition of a "dangerous weapon" in §§ 939.22(10) and 948.61, STATS., prohibiting the possession of a dangerous weapon on school premises. Resolution of this issue involves statutory interpretation.

Statutory interpretation is a question of law which appellate courts review without deference to the deci-

---

[1] We recognize that the nature of air guns is such that they are often interchangeable so as to be either a BB gun or a pellet gun. A "BB" is a small round object that is often made of copper or brass. A "pellet" is slightly larger than a BB and has a flat front and an indented conical rear so as to trap the air as it is propelled through a barrel. Pellets are most often constructed from lead. In the present case, the gun in question could discharge either BBs or pellets. For ease in reading, we will simply utilize the term "BB gun" to describe the weapon.

sion of the lower courts. *State ex rel. Town of Delavan v. Circuit Court for Walworth County*, 167 Wis. 2d 719, 723, 482 N.W.2d 899, 900-01 (1992). The cardinal rule in statutory interpretation, as the supreme court has often said, is "to discern the intent of the legislature." *Scott v. First State Ins. Co.*, 155 Wis. 2d 608, 612, 456 N.W.2d 152, 154 (1990). This court ascertains that intent by examining the language of the statute and its scope, history, context, subject matter and purpose. *Id.* In determining the legislature's intent, we must presume that "the legislature intended an interpretation that advances the purposes of the statute." *State v. Zielke*, 137 Wis. 2d 39, 46, 403 N.W.2d 427, 430 (1987). Additionally, in construing a statute we must interpret it in such a way as to avoid an absurd or unreasonable result. *State v. Moore*, 167 Wis. 2d 491, 496, 481 N.W.2d 633, 635 (1992).

Section 948.61, STATS., states in relevant part:

**(1)** In this section:

(a) "Dangerous weapon" has the meaning specified in s. 939.22(10), except "dangerous weapon" does not include any firearm.

(b) "School" means a public, parochial or private school which provides an educational program for one or more grades between grades 1 and 12 and which is commonly known as an elementary, middle school, junior high school, senior high school or high school.

(c) "School premises" means any school building, grounds, recreation area or athletic field or any other property owned, used or operated for school administration.

**(2)** Any person who knowingly possesses or goes armed with a dangerous weapon on school premises is guilty of:

(a) A Class A misdemeanor.

Section 939.22(10), STATS., defines a "dangerous weapon" as: (1) any firearm, whether loaded or unloaded; (2) any device designed as a weapon and capable of producing death or great bodily harm; (3) any electric weapon as defined in § 941.295(4), STATS.; or (4) any other device or instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm.

■

Section 948.61, STATS., by its clear wording, excludes firearms and electric weapons. Both parties agree that a BB gun is neither a firearm nor an electric weapon. Consequently, we are left with the question of whether a BB gun is either a "device designed as a weapon and capable of producing death or great bodily harm" or is a "device or instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm."

In *Rafferty v. State*, 29 Wis. 2d 470, 474-78, 138 N.W.2d 741, 743-45 (1966), the supreme court was asked to determine whether a pellet gun was a dangerous weapon within the meaning of § 943.32(2), STATS.[2] To answer the question, the court considered whether a pellet gun was a " 'device designed as a weapon and capable of producing death or great bodily harm.' " *Id.* at 475, 138 N.W.2d at 744. After a careful analysis, the court concluded that "a pellet gun used as a compressed-air weapon is a dangerous weapon calculated or likely to produce great bodily harm." *Id.* at 477, 138

---

[2] Section 943.32(2), STATS., reads: "Whoever violates sub. (1) [robbery] by use or threat of use of a dangerous weapon or any article used or fashioned in a manner to lead the victim reasonably to believe that it is a dangerous weapon is guilty of a Class B felony."

N.W.2d at 745.[3] This language, Michelle's allegations to the contrary notwithstanding, is not conditioned upon the specific factual setting of *Rafferty* which involved robbery, nor is it conditioned upon whether the pellet gun involved in *Rafferty* was used as a bludgeon.

Here, the trial court, in reaching its decision, stated:

> First as to the issue of dangerous weapon. It's already been held in *State v. Antes*, 74 Wis. 2d 317, 1246 [sic] Wis. 2d [sic] 671 that unloaded pellet gun qualified and it's designed as a weapon and used as a bludgeon is capable of producing great bodily harm, and the court finds this is a dangerous weapon.

The trial court's determination appears to be based on a mixing of the second and third definitions of a dangerous weapon contained in § 939.22(10), STATS. Although we reach the same result as the trial court, we do so in a different manner. *Liberty Trucking Co. v. DILHR*, 57 Wis. 2d 331, 342, 204 N.W.2d 457, 464 (1973) (appellate court may sustain a lower court's holding on a theory or on reasoning not presented to the lower court).

As referenced above, the supreme court in *Rafferty* stated in unequivocal language that a gun utilized as a compressed-air weapon is dangerous and likely to produce great bodily harm. This conclusion corresponds to

---

[3] In *State v. Antes,* 74 Wis. 2d 317, 246 N.W.2d 671 (1976), the supreme court reaffirmed the *Rafferty* holding by concluding that a pellet gun utilized during the course of a robbery, whether loaded or unloaded, could properly be considered a "dangerous weapon" under § 939.22(10), STATS.

the language in § 939.22(10), STATS. — "any device designed as a weapon capable of producing death or great bodily harm" — and is reasonable. Similarly, a determination that a BB gun is a dangerous weapon within the meaning of § 939.22(10) advances the purposes of § 948.61, STATS., which was designed to provide a safe environment for learning in our schools. A contrary construction of the statute would lead to the absurd result that a student could lawfully carry an instrument capable of firing a lead or brass projectile at over 750 feet per second on school grounds.[4] We reject this result. Consequently, we conclude that the BB gun possessed by Michelle is properly encompassed in the definition of § 939.22(10) as incorporated in § 948.61.

The trial court also concluded that Michelle "knowingly possessed" the BB gun while on school premises. When a trial court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses, *Gehr v. City of Sheboygan*, 81 Wis. 2d 117, 122, 260 N.W.2d 30, 33 (1977), and may apportion the weight to be given to each witness' testimony, *see Milbauer v. Transport Employees' Mut. Benefit Society*, 56 Wis. 2d 860, 865, 203 N.W.2d 135, 138 (1973). This is true

---

[4] In *Rafferty*, the supreme court discussed several different types of air guns. The court noted the following:

> The Benjamin pump pistol will penetrate about one-fourth inch of pine. A pump-gun rifle may penetrate as much as an inch into a pine board. Smith [a guide to air guns] states that the Sheridan Super pump rifle has a muzzle velocity of 770 feet per second, and "pests or vermin can be killed as much as 60 yards or 70 yards distance from the muzzle. The Sheridan has been used as a rat exterminator on the Los Angeles dumps, as a hog stunner for slaughtering on farms, and for killing trapped foxes...."

*Rafferty*, 29 Wis. 2d at 476, 138 N.W.2d at 744 (citations omitted).

because the trier of fact has the opportunity to observe the witnesses and their demeanor on the witness stand. *Syvock v. State*, 61 Wis. 2d 411, 414, 213 N.W.2d 11, 13 (1973). Finally, we are guided by the principle that a trial court's findings of fact will not be overturned unless clearly erroneous. *See* § 805.17(2), STATS.

Following the bench trial, the trial court made the following oral findings:

> I find her story, to use the district attorney's characterization, "inherently incredible."
>
> It's a heavy gun. There is no way she could have carried that in her coat pocket without knowing it was there, and I find [Michelle's] testimony contradicts Ms. Pieper's testimony and I find Ms. Pieper to be more credible. She had no reason to lie. So the Court does find the juvenile guilty beyond a reasonable doubt.

█

Our independent review reveals that the trial court carefully considered the testimony of the witnesses and rendered a decision based on its perception concerning each witness' credibility. We can discern no findings of fact that were clearly erroneous. Nor has Michelle pointed to testimony in her brief demonstrating that the trial court's findings were clearly erroneous. Therefore, we affirm the trial court's findings that Michelle knowingly possessed a dangerous weapon on the school premises.

*By the Court.*—Order affirmed.